Barry I. Levy, Esq.
Michael Vanunu, Esq.
Allison N. Stapleton, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                           Plaintiffs,

        -against-

SERGEY KALITENKO, M.D., SERGEY KALITENKO,
M.D. (A Sole Proprietorship), SERGEY A. KALITENKO
PHYSICIAN, P.C., and JOHN DOE DEFENDANTS "1"
through "10",

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by
Jury**

## COMPLAINT

     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants Sergey Kalitenko, M.D., Sergey

Kalitenko, M.D. (A Sole Proprietorship), Sergey A. Kalitenko Physician, P.C. and John Doe

Defendants "1" through "10" (collectively, referred to hereinafter as the "Defendants"), hereby

allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $510,000.00 that the Defendants have wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services styled as videonystagmus ("VNG") testing, transcranial doppler tests ("TDT") and extracorporeal shockwave therapy ("ESWT") (collectively the "Fraudulent Services"). The Fraudulent Services allegedly were provided to New York automobile accident victims who were insured by GEICO ("Insureds").

2.      In addition to recovering the money wrongfully obtained, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of approximately $3.1 million pending no-fault insurance claims for the Fraudulent Services because:

(i)      the Fraudulent Services were allegedly provided by and billed through the Kalitenko Practices (as defined below), which are medical "practices" not under the control and direction of Sergey Kalitenko, M.D., but rather, were at all relevant times operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers;

(ii)      the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics (as defined below);

(iii)      the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(iv)      the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided to Insureds; and

(v)      the Fraudulent Services, to the extent provided at all, were not provided by Sergey Kalitenko, M.D. or any other licensed physician, but by persons who

were unlicensed, and were neither directly supervised by Sergey Kalitenko, M.D. or employed by him or any of the Kalitenko Practices.

3.      Defendant Sergey Kalitenko, M.D. ("Kalitenko") is a New York physician who purports to own and operate two medical "practices", with one as a sole proprietorship, using Tax Identification Number 88-079xxxx (the "Kalitenko Sole Proprietorship") and the second under Sergey A. Kalitenko Physician, P.C., using Tax Identification Number 11-362xxxx ("Kalitenko PC") (collectively, the "Kalitenko Defendants"). Kalitenko purported to have used the Kalitenko Sole Proprietorship and Kalitenko PC (collectively, the "Kalitenko Practices") to provide the Fraudulent Services, which primarily consisted of rendering ESWT, to more than five-hundred twenty (520) GEICO Insureds in a period of approximately five (5) months.

4.      In fact, the Kalitenko Defendants in combination with John Doe Defendants "1" through "10" (hereinafter the "John Doe Defendants"), engaged in a massive fraudulent insurance scheme against GEICO and the New York automobile insurance industry in which they billed GEICO alone more than $3.75 million through the Kalitenko Practices for the alleged performance of the Fraudulent Services at more than forty five (45) separate locations from October 11, 2021 through March 31, 2022. Notably, more than 2,350 claim submissions were made to GEICO seeking payment of no-fault benefits for the Fraudulent Services, all of which represented that Kalitenko was the legitimate owner of the Kalitenko Practices and that he allegedly performed all the Fraudulent Services. In truth, Kalitenko performed none of the Fraudulent Services and did not legitimately operate, manage or control any of the Kalitenko Practices.

5.      In or about 2021, the Defendants engineered this fraudulent scheme on the heels of material changes adopted by the New York Department of Financial Services regarding the application of the New York Workers Compensation Fee Schedule ("Fee Schedule") to New York's no-fault reimbursement. Those changes eliminated billing abuses and fraudulent treatment

practices that had plagued the automobile insurance industry for more than a decade by, among other things: (i) making many services that had been historically abused either ineligible for reimbursement or subject to reduced reimbursement; (ii) limiting chiropractor billing to CPT codes in the chiropractic section of the fee schedule; and (iii) controlling reimbursement among providers who rendered concurrent care to patients by establishing daily reimbursement limits for all related disciplines.

6.      In contrast to these changes, the Fee Schedule changes did not materially alter reimbursement for performance of the Fraudulent Services and, importantly, for the first time established a definitive rate of reimbursement of approximately $700.00 for performance of ESWT, which has historically been a Category III Code (0101T) with a "BR" designation, meaning that definitive reimbursement had not previously been established.  Prior to October 2020, ESWT was virtually never performed on automobile accident patients or billed to automobile insurers, in part because of the lack of established reimbursement and because – if properly performed – service required considerable investment, including direct involvement by a physician in the performance of the service and the use of physical equipment that is very costly and is not typically portable.

7.      Defendants seized on these changes in the Fee Schedule (or lack thereof). The Kalitenko Defendants in association with the John Doe Defendants concocted a fraudulent treatment and billing scheme pursuant to which:

> (i)     unlicensed "technicians" would allegedly render the Fraudulent Services on an itinerant basis at a large number of multidisciplinary "clinics" located throughout the New York metropolitan area that purported to provide treatment to patients with no-fault insurance, but which in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud (the "Clinics");

    (ii)    the unlicensed "technicians" would then generate falsified reports to create a false justification for the performance of the medically unnecessary and illusory Fraudulent Services; and

    (iii)    the reports, documents and bills for thousands of dollars per patient per date of treatment would be sent to New York automobile insurance companies, including GEICO, seeking payment for the performance of the Fraudulent Services.

8.    The success of the fraudulent scheme required coordination between the Kalitenko Defendants and the John Doe Defendants. In furtherance of the fraudulent scheme, they took the following actions:

    (i)    Kalitenko allowed the John Doe Defendants to use his name, medical license, the Kalitenko Sole Proprietorship, and Kalitenko PC to bill GEICO and other New York automobile insurance companies for the alleged performance of the Fraudulent Services;

    (ii)    The Kalitenko Defendants associated with "processors" who are among the John Doe Defendants. Processors are individuals and/or entities within the no-fault industry who earn money by: (i) establishing relationships with laypersons that are associated with the Clinics; (ii) collecting the no-fault claims (i.e. the paperwork) from the Clinics for services that are allegedly provided to individuals covered by no-fault insurance; and (iii) referring the no-fault billing and collection work to New York collection lawyers; and

    (iii)    The Kalitenko Defendants, through their association with the John Doe Defendants, established illegal referral and kickback arrangements with the owners and/or managers of the Clinics to allow the Defendants to access a steady stream of patients to be able to fraudulently bill GEICO and other automobile insurers, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

9.    Once the pieces were in place, the John Doe Defendants: (i) used Kalitenko's medical license, tax identification numbers of the Kalitenko Practices and electronic copies of his signature to generate mass quantities of false and fraudulent documents, including NF-3 forms (i.e. bills), assignment of benefit forms, and medical records; and (ii) used the Kalitenko Practices as fictional healthcare "practices" to serve as billing vehicles through which millions of dollars of

billing for the Fraudulent Services could be submitted to GEICO and other New York automobile insurers.

10.     Because the Kalitenko Practices were nothing more than shells to hide the John Doe Defendants' participation in the scheme, it was equally critical to the success of the fraudulent scheme for the Kalitenko Defendants and the John Doe Defendants to partner with New York collection attorneys who were willing to:

     (i)     purport to represent the physician and the billing entities;

     (ii)    provide for or arrange for "funding" (i.e. financing against receivables) of the fraudulent billing to be submitted to GEICO and other New York insurers in connection with the unlawful scheme through companies in which the attorney/law firms either owned or with whom they had relationships;

     (iii)   pursue payment and collection against GEICO and other New York automobile insurers by knowingly: (a) submitting fraudulent bills to the insurers for the Fraudulent Services, and (b) pursuing collection lawsuits and/or arbitrations seeking payment on the claims that were denied or claimed to have been improperly paid; and

     (iv)   accept the insurance payments received from automobile insurers through their attorney IOLA/Trust accounts, and then distribute the payments to third parties, including the John Doe Defendants.

11.     At the time, the John Doe Defendants had an ongoing relationship with several collection attorneys, and because of their position in the industry and ongoing relationships, the John Doe Defendants had in their possession copies of documents used by the collection lawyers that would be needed to facilitate the funding (*i.e.*, the securing of advances against the claims) and the billing and collections on the fraudulent claims, including documents such as retainer letters, payment directives, and funding agreements.

12.     At the time, the John Doe Defendants used the information received from Kalitenko to manufacture: (i) the claim documents necessary to support the fraudulent claim submissions, including assignment of benefits ("AOBs") forms and other medical records;  (ii) the engagement

letter and associated documents needed by the collection lawyers to bill and collect on the Fraudulent Services; and (iii) the funding agreements to present to companies who were willing to advance money against the receivables (the "Funders"). Once the documents were in place with the Funders, the Funders began transferring money to the John Doe Defendants as "advances" against the claims for the Fraudulent Services. The John Doe Defendants were not signatories to the funding agreements, received the money without risk, and used the payments received from the Funders for their own benefit, as well as to pay individuals and entities to perpetuate the Defendants' fraudulent scheme.

13.     Additionally, the John Doe Defendants regularly provided the package of documents associated with billing, collection and funding efforts to the collection lawyers and thereafter, began to transfer fabricated claim documents to the collection lawyers. Once the documents were processed by the collection lawyers into bills (i.e., "NF-3" forms) using the names of the Kalitenko Practices, the collection lawyers organized the claim submissions and mailed them to GEICO and other insurance companies seeking payment. The collection lawyers:

(i)      purported to represent Kalitenko and the Kalitenko Practices in thousands of writings sent to GEICO;

(ii)     arranged and/or interfaced to effectuate the "funding" of the bills that were submitted to GEICO and other New York insurers in the names of the Kalitenko Practices;

(iii)    systemically pursued payment and collection against GEICO and other New York automobile insurers on behalf of the Kalitenko Practices, and

(iv)     collected insurance payments from GEICO and other New York automobile insurers and deposited those payments into their IOLA/Trust Accounts.

14.     As discussed herein, the Defendants at all relevant times have known that: (i) Kalitenko was not in the control of the Kalitenko Practices, but were operated, managed and controlled by the John Doe Defendants for purposes of effectuating a large scale insurance fraud

scheme; (ii) the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; and (iv) the Fraudulent Services, to the extent provided at all, were never performed by Kalitenko or by any other licensed physician but by persons who were never supervised by Kalitenko or employed by either of the Kalitenko Practices.

15.     The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that the Defendants submitted, or caused to be submitted, to GEICO through the Kalitenko Practices.

16.     Defendants do not now have – and never had – any right to be compensated for or to realize any economic benefit from the Fraudulent Services that they billed to GEICO.

17.     Defendants' fraudulent scheme began in 2021 and has continued uninterrupted through the present day as Defendants continue to seek collection on pending charges for the Fraudulent Services. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $510,000.00.

## THE PARTIES

### I.     Plaintiffs

18.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

## II.   <u>Defendants</u>

19.     Defendant Kalitenko resides in and is a citizen of New York. Kalitenko is a physician licensed to practice medicine and agreed to allow for the formation of the Kalitenko Sole Proprietorship and the use of Kalitenko PC and to "front" as their owners while allowing the John Doe Defendants to use his license and the Kalitenko Practices as billing "vehicles" as part of the fraudulent scheme committed against GEICO and other New York automobile insurers.

20.     Kalitenko Sole Proprietorship is a sole proprietorship that operates in New York and lists its principal place of business as 8295 North Military Trail, West Palm Beach, Florida (the "Florida Location").

21.     Kalitenko PC is a New York professional corporation with its principal place of business listed as 2158 Ocean Avenue, Brooklyn, New York (the "Ocean Avenue Location.")

22.      John Doe Defendants are citizens of New York. John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with the Kalitenko Defendants by: (i) unlawfully operating, managing and controlling the Kalitenko Practices; (ii) establishing relationships with the laypersons associated with the Clinics; (iii) collecting the no-fault claims (i.e., the paperwork) from the Clinics for the Fraudulent Services; (iv) arranged for and providing the funding associated with the Fraudulent Services; and (v) referring the no-fault billing and collection work associated with the Fraudulent Services to New York collection lawyers.

### <u>JURISDICTION AND VENUE</u>

23.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

24.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

25.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

26.     GEICO underwrites automobile insurance in New York.

## I.     An Overview of Pertinent Law Governing No-Fault Reimbursement

27.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

28.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

29.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

30.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").   In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

31.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

32.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York ….   (Emphasis added).

33.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

34.     Unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

35.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.   See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

36.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. See, e.g., New York Education Law § 6512, § 6530(11), and (19).

37.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments or allows unlicensed laypersons to share in the fees for the professional services.

38.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

39.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

40.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not

eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

41.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

42.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code was performed on the patient; (ii) the service described by the specific CPT code was performed in a competent manner and in accordance with applicable laws and regulations; (iii) the service described by the specific CPT code was reasonable and medically necessary; and (iv) the service and the attendant fee were not excessive.

43.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     Defendants' Fraudulent Scheme

### A.     Kalitenko and His Recruitment

44.     Kalitenko is a physician who became licensed to practice medicine in New York in 1998.  Kalitenko also holds medical licenses in both Florida and Michigan.

45.     According to public record searches, Kalitenko operates an internal medicine practice primarily in Brooklyn from the Ocean Avenue Location, pictured below:



46.    According to information published by Kalitenko, he has no experience in physiatry, rehabilitative medicine or electro-diagnostic testing, which are the areas of medicine associated with the Fraudulent Services.  Indeed, the fraudulent nature of Kalitenko's participation in the scheme is demonstrated by his own words.  Despite claiming that he allegedly rendered more than $3.1 million in healthcare services to Insureds over a period of approximately five (5) months, Kalitenko actually advertises to the public that he has completely rejected traditional western medicine, and believes that "holistic" medicine is the only manner by which patients should be treated.  On his website, he states as follows:

> "As a medical professional, I vow to do everything in my power to make accurate diagnoses and avoid harmful chemicals and drugs. By using a holistic approach in my practice, I am allowed the time to do that. I spend hours with each patient, dwelling over their wellness possibilities and doing everything necessary to solve their issues. After spending time getting to know the patient's lifestyles, routines and health practices, I stand a much better chance of finding and fixing the root cause. My goal is to help the patient lead a healthier and more whole life, not to get them in and out as fast as I can. That's what it means to be a holistic doctor.

See https://kalitenko.com/Dr-Kalitenko-Holistic-Approach-A-Word-from-the-Doctor

47.     Kalitenko PC represented in its bills to GEICO that it operated from four (4) separate locations in Queens and/or Brooklyn, none of which included the Ocean Avenue Location.  In contrast to the Ocean Avenue Location, Kalitenko has never publicly represented that it has practiced medicine and/or operated at any of the four locations identified in the bills to GEICO.

48.     In addition to purportedly operating Kalitenko PC at the Ocean Avenue Location, Kalitenko purportedly operates an internal medicine practice in Florida. Through his website www.doctorkalitenko.com, Kalitenko advertises that he available to treat patients at specified hours on Tuesdays, Thursdays, and Sundays from the Florida Location, which is pictured below:



49.     In 2021, Kalitenko was recruited by the John Does Defendants to participate in a complex insurance fraudulent scheme to bill GEICO and other New York automobile insurers millions of dollars for medically unnecessary, experimental, and otherwise reimbursable services. Based on the arrangement, Kalitenko would receive a periodic payment in exchange for allowing

his name, license and the tax identification numbers of the Kalitenko Practices to be used and would contend that he supervised the Fraudulent Services if any insurance company ever inquired.

### B.   Gaining Access to Insureds

50.     The Kalitenko Sole Proprietorship has never had any legitimate indicia. It had no fixed treatment locations of any kind, did not maintain stand-alone practices, was not the owner or leaseholder in any of the real property from which it purported to provide the Fraudulent Services, did not employ its own support staff, and did not advertise or market its services to the general public.

51.     Similarly, the Kalitenko PC has never had legitimate indicia associated with the Fraudulent Services billed to GEICO. The Kalitenko PC purportedly had "offices" at four separate Clinics, did not provide any fraudulent services at its actual operating location, *i.e.* the Ocean Avenue Location, was not the owner or leaseholder of any of the real property from which it purported to provide the Fraudulent Services, did not employ their own support staff at the Clinics where it purported to provide the Fraudulent Services, and did not advertise or market its services at the Clinics to the general public.

52.     In fact, the John Doe Defendants controlled the fraudulent scheme by using the name of Kalitenko and the Kalitenko Practices on an itinerant basis in connection with the performance of the Fraudulent Services from more than forty-five (45) separate Clinics, primarily located in Brooklyn, Queens, and Bronx, where they were given access to steady volumes of patients pursuant to the unlawful referral arrangement, including the following:

| Clinic - Street Address | Clinic – Borough/County |
| --- | --- |
| 92-08 Jamaica Ave | Woodhaven |
| 9701 101st Ave | Jamaica |
| 3910 Church Ave | Brooklyn |
| 108 Kenilworth Pl | Brooklyn |
| 1120 Morris Park Ave | Bronx |

| | |
|---|---|
| 1849 Utica Ave | Brooklyn |
| 1655 Richmond Ave | Staten Island |
| 1611 E New York Ave | Brooklyn |
| 652 E Fordham Rd | Bronx |
| 611 E 76th St | Brooklyn |
| 4009 Church Ave | Brooklyn |
| 1735 Pitkin Ave | Brooklyn |
| 717 Southern Blvd | Bronx |
| 3250 Westchester Ave | Bronx |
| 30 S Central Ave | Valley Stream |
| 219-16 Linden Blvd | Cambria Heights |
| 599 Southern Blvd | Bronx |
| 695 Dutchess Turnpike | Poughkeepsie |
| 243-51 Merrick Blvd | Queens |
| 2488 Grand Concourse | Bronx |
| 1568 Ralph Ave | Brooklyn |
| 150 Graham Ave | Brooklyn |
| 240-19 Jamaica Ave | Bellerose |
| 282-284 Avenue X | Brooklyn |
| 2088 Flatbush Ave | Brooklyn |
| 66-42 Myrtle Ave | Glendale |
| 3000 Eastchester Rd | Bronx |
| 488 Lafayette Ave | Brooklyn |
| 2273 65th St | Brooklyn |

53.    To obtain access to the Clinics' patient base (*i.e.*, the Insureds), the Defendants entered into illegal financial and kickback arrangements with the unlicensed persons who controlled the Clinics, who provided access to the patients that were treated, or who purported to be treated, at the Clinics. Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality, were organized to supply "one-stop" shops for no-fault insurance fraud.

54.    Clinics provided facilities for the Defendants, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical

therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

55.     In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

56.     For example, GEICO has received billing for purported healthcare services rendered at the Clinic located at 3000 Eastchester Road, Bronx, New York (the "Eastchester Road Clinic") from a revolving door of more than two hundred and twenty-five (225) purportedly different healthcare providers.

57.     As additional examples, GEICO also received billing for purported healthcare services from the Defendants at the following locations, each of which contained an ever-changing number of fraudulent healthcare providers:

> (i)     The Clinic located at 3910 Church Avenue, Brooklyn, was a revolving door of more than 190 purportedly different healthcare providers;

> (ii)     The Clinic located at 717 Southern Boulevard, Bronx, was a revolving door of more than 170 purportedly different healthcare providers;

> (iii)     The Clinic located at 1655 Richmond Avenue, Staten Island, was a revolving door of more than 140 purportedly different healthcare providers;

> (iv)     The Clinic located at 1120 Morris Park Avenue, Bronx, was a revolving door of more than 130 purportedly different healthcare providers;

> (v)     The Clinic located at 1568 Ralph Avenue, Brooklyn, was a revolving door of more than 100 purportedly different healthcare providers;

(vi)     The Clinic located at 92-08 Jamaica Avenue, Woodhaven, was a revolving door of more than 70 purportedly different healthcare providers; and

(vii)    The Clinic located at 97-01 101st Avenue, Queens, was a revolving door of more than 65 purportedly different healthcare providers.

58.     At each of the Clinics, unlicensed laypersons, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base. Clinics willingly provided patient access to the Defendants in exchange for kickbacks and other financial incentives because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and therefore catered to a high volume of Insureds at the locations.

59.     In keeping with the fact that the Clinics provided access to patients in exchange for kickbacks and other financial incentives, three of the Clinics where the Defendants purportedly provided Fraudulent Services to Insureds: (i) the Clinic located at 2273 65th Street, Brooklyn, New York; (ii) the Clinic located at 488 Lafayette Avenue, Brooklyn, New York; and (iii) the Clinic located at 717 Southern Boulevard, Bronx, New York, are locations that have been the subject of a recent indictment involving numerous individuals who allegedly paid monies to hospitals, medical providers and others for confidential patient information and the patients would be contacted and "referred" for medical treatment from a select network of medical clinics (and lawyers) in New York and New Jersey that paid kickbacks to the indicted individuals. See United States of America v. Anthony Rose, et al., 19-cr-00789(PGG)(SDNY 2019).

60.     In general, the referral sources at the Clinics were paid a sum of money in untraceable cash or payments typically disguised as "rent". They were, in reality, kickbacks for referrals, and the relationship was a "pay-to-play" arrangement. In connection with this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" for the performance of the Fraudulent Services.

61. As a result of this arrangement, the Defendants subjected Insureds at the Clinics to the Fraudulent Services despite there being no clinical basis for the services, had them undergo phony testing, and submit to purported therapy services that were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

62. For example, at the Clinic located at 3910 Church Avenue, Brooklyn, New York ("Church Ave Clinic"), where Defendants purportedly performed more Fraudulent Services than at any other location, the treatment provided to the Insureds was overseen and directed by unlicensed persons. These unidentifiable laypersons directed the Insureds' medical care pursuant to predetermined treatment protocols, without regard for medical necessity, and in a manner to maximize the amount of No-Fault Benefits that could be obtained from each Insured.

63. As part of overseeing and directing the medical care of Insureds and other patients at the Church Ave Clinic, and as part of the illegal kickback and financial arrangement, the unidentifiable laypersons ordered the Clinic "representatives" to direct patients to the Defendants for the performance of Fraudulent Services, which were medically unnecessary and part of a predetermined fraudulent protocol.

64. In keeping with the fact that the Clinics controlled the patient base and that the Kalitenko Practices were simply two of several interchangeable "cogs" in the fraud wheel, there were numerous instances between October 2021 and March 2022 where the Kalitenko Practices were: (i) allegedly providing the Fraudulent Services on Insureds at a Clinic location at the same time that other medical practices were performing the Fraudulent Services on Insureds, and (ii) was one of numerous "providers" rendering the Fraudulent Services at specific Clinic locations in weekly sequences.

65.     Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to whichever practice was being given access to the Insureds on a given day pursuant to the unlawful payment and referral arrangement.

### C.     Defendants Place the Fraudulent Scheme Into Motion

66.     Once all the necessary "pieces" were in place and Kalitenko had ceded control over to the John Doe Defendants, the fraud scheme was placed into overdrive. John Doe Defendants began to illegally operate and manage the Kalitenko Practices and implemented the fraudulent billing and treatment scheme using a "quick hit" strategy, billing GEICO and other New York automobile insurers millions of dollars for the performance of the Fraudulent Services in a matter of months, thereby attempting to limit the insurance companies' ability to investigate and address the scheme.

67.     The Defendants "quick hit" scheme involved using both of the Kalitenko entities in sequential order. Between October 11, 2021, and January 28, 2022, Kalitenko and the John Doe Defendants used the Kalitenko PC to bill GEICO and other New York automobile insurers for ESWT purportedly performed on Insureds as a way to "test" the insurance industry to see whether they could obtain money from their fraudulent scheme before GEICO could investigate and address the scheme. During the three (3) month period between October 2021 and January 2022, the Defendants submitted more than 580 bills to GEICO involving 82 separate patients and sought more than $780,000.00. As a direct result of the Defendants scheme, through the Kalitenko PC, the Defendants fraudulently obtained more than $395,000.00 from GEICO.

68.     After the Defendants tested their fraudulent scheme using the Kalitenko PC, they abandoned use of the entity and used the Kalitenko Sole Proprietorship in its place.  Between January

28, 2022 and March 31, 2022 (less than nine weeks), the Defendants billed GEICO alone more than $3 million for Fraudulent Services purportedly performed on Insureds. During this short period, the Defendants, through the Kalitenko Sole Proprietorship, submitted more than 1750 bills to GEICO involving more than 750 separate patients.

69.     As part of the scheme, the John Doe Defendants arranged to have the account receivables associated with the GEICO billings for the Fraudulent Services "funded" through the Funders with the assistance of the collection lawyers and arranged for documents to be signed directing the payments to be made to them and other third parties rather than Kalitenko.

70.     As a result of those efforts, the John Doe Defendants received hundreds of thousands, if not millions, of dollars in advances on the claims for the Fraudulent Services from the Funders without any risk because they were never signatories to the agreements. In addition, the John Doe Defendants had the collection lawyers begin billing GEICO and other New York automobile insurers for the Fraudulent Services.

71.     Through the funding and collection arrangement, the John Doe Defendants controlled the Kalitenko Practices and were able to realize an immediate financial benefit because they were paid a percentage on the face value of the billings submitted to GEICO for the Fraudulent Services. The collection lawyers (in turn) would be compensated through the payment of other monies from the insurance companies, including legal fees associated with the collections as well as interest and other charges to be repaid from the collections on the claims for the Fraudulent Services.

72.     An overwhelming majority of the claims was accompanied by a letter from the collection lawyers, representing that they were legal counsel to Kalitenko and the Kalitenko

Practices in connection with the collection of charges from GEICO for the performance of the Fraudulent Services.

### D.     The Fraudulent Billing and Treatment Protocols Employed by The Defendants

73.     The Fraudulent Services billed in the name of the Kalitenko Practices were not medically necessary and were provided, to the extent they were provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds. The Fraudulent Services were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

74.     Neither Kalitenko nor any other licensed physicians were ever involved in the performance of the Fraudulent Services.  In fact, unlicensed laypersons, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base at the Clinics. Once they were given access, the John Doe Defendants arranged to have Insureds at the Clinics subjected to the Fraudulent Services by unlicensed technicians that they controlled despite there being no clinical basis for the services and submit to purported therapy services that were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

75.     In fact, there was no physician involvement with the performance of any of the Fraudulent Services and the only point in having the Insureds seen by the unlicensed technicians was to get the patient's signature on a piece of paper so that the John Doe Defendants could get money from the Funders and transmit the claims to the collection lawyers so that they could generate bills and submit them to GEICO seeking payment for the Fraudulent Services to earn their compensation.

76.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the John Doe Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.

77.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

78.     No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. This conclusion is reinforced by the fact that there was no physician involvement in any of the Fraudulent Services allegedly performed on Insureds and billed to GEICO.

**1.     The Fraudulent Charges for "Extracorporeal Shockwave Therapy"**

79.     Defendants purported to systemically subject Insureds to medically unnecessary ESWT "treatments". In keeping with the fact that the Defendants intended to conceal the absence of any physician involvement and that the Kalitenko Practices were just two of several billing entities that they used, the John Doe Defendants arranged to have the services documented on a generic "form", on which they simply stamped Kalitenko's name using his residential address, 311 Brighton 1st Street, Brooklyn, New York and applied an electronic signature. The following is a representative example:

80.     Of consequence, the claims submitted to GEICO by the Defendants with an NF-3 form that falsely represented that Kalitenko performed ESWT "treatments" included "reports" that virtually always contained a duplicated signature for Kalitenko, which appears to simply be a signature stamp. Neither the "notes" associated with the ESWT "treatments" nor the claims that were submitted to GEICO by the Defendants ever identified who actually performed the service on the Insured.

81.     The billing data associated with the claims submissions made to GEICO corroborates the fraudulent nature of the billing/treatment protocols.  According to the billing, the ESWT "treatment" alleged to have been performed on Insureds between October 11, 2021 to March 31, 2021 purported that: (i) approximately 1,900 separate ESWT services were performed;

(ii) the ESWT services were performed on more than 710 separate patients; (iii) the ESWT services was performed at forty-five (45) separate locations; and (iv) the ESWT services were provided at multiple locations at the same day, with multiple instances including ten (10) or more separate treatment locations on some days.

82.　　For example:

(i)　　The Defendants billed GEICO for purportedly providing ESWT "treatment" on March 24, 2022, to 66 different Insureds at 16 different Clinics in three different counties in the New York Metropolitan area.

(ii)　　The Defendants billed GEICO for purportedly providing ESWT "treatment" on February 9, 2022, to 60 different Insureds at 13 different Clinics in four different counties in the New York Metropolitan area.

(iii)　　The Defendants billed GEICO for purportedly providing ESWT "treatment" on February 15, 2022, to 52 different Insureds at 13 different Clinics in three different counties in the New York Metropolitan area.

(iv)　　The Defendants billed GEICO for purportedly providing ESWT "treatment" on March 17, 2022, to 52 different Insureds at 14 different Clinics in three different counties in the New York Metropolitan area.

(v)　　The Defendants billed GEICO for purportedly providing ESWT "treatment" on February 16, 2022, to 49 different Insureds at 13 different Clinics in four different counties in the New York Metropolitan area.

(vi)　　The Defendants billed GEICO for purportedly providing ESWT "treatment" on February 7, 2022, to 45 different Insureds at 11 different Clinics in five different counties in the New York Metropolitan area.

(vii)　　The Defendants billed GEICO for purportedly providing ESWT "treatment" on March 15, 2022, to 44 different Insureds at 11 different Clinics in three different counties in the New York Metropolitan area.

(viii)　　The Defendants billed GEICO for purportedly providing ESWT "treatment" on March 9, 2022, to 43 different Insureds at 10 different Clinics in three different counties in the New York Metropolitan area.

(ix)　　The Defendants billed GEICO for purportedly providing ESWT "treatment" on February 17, 2022, to 43 different Insureds at 11 different Clinics in two different counties in the New York Metropolitan area.

(x)     The Defendants billed GEICO for purportedly providing ESWT "treatment" on February 2, 2022, to 35 different Insureds at 9 different Clinics in three different counties in the New York Metropolitan area.

83.     Once documented by the unidentified technicians, the Defendants then billed GEICO for the performance of ESWT using the tax identifications under associated with the Kalitenko Practices using CPT code 0101T.

| | | Code | Description | Relative Value | FUD | PC/TC Split |
|---|---|---|---|---|---|---|
| ■ | | 0042T | Cerebral perfusion analysis using computed tomography with contrast administration, including post-processing of parametric maps with determination of cerebral blood flow, cerebral blood volume, and mean transit time | 15.44 | XXX | |
| ■ | + | 0054T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on fluoroscopic images (List separately in addition to code for primary procedure) | 2.47 | XXX | |
| ■ | + | 0055T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on CT/MRI images (List separately in addition to code for primary procedure) | 3.23 | XXX | |
| | | 0058T | Cryopreservation; reproductive tissue, ovarian | BR | XXX | |
| | | 0071T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume less than 200 cc of tissue | BR | XXX | |
| | | 0072T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume greater or equal to 200 cc of tissue | BR | XXX | |
| ■ | | 0075T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; initial vessel | 18.68 | XXX | |
| ■ | + | 0076T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; each additional vessel (List separately in addition to code for primary procedure) | 17.50 | XXX | |
| | | 0085T | Breath test for heart transplant rejection | BR | XXX | |
| | + | 0095T | Removal of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| | + | 0098T | Revision including replacement of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| ■ | | 0100T | Placement of a subconjunctival retinal prosthesis receiver and pulse generator, and implantation of intra-ocular retinal electrode array, with vitrectomy | 16.22 | XXX | |
| ■ | | 0101T | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy | 2.78 | XXX | |

**CATEGORY III CODES**                                                   **0042T–0504T**
**Medical Fee Schedule**                                          **Effective April 1, 2019**

84.     As noted, CPT code 0101T is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology. Temporary codes may become permanent codes or deleted during updates of the code set.  Additionally, and as noted in the Fee Schedule, the CPT code (i) is scheduled to be paid using the conversion rate for surgical services, and (ii) does not distinguish between a professional component and technical component, thus confirming that the service need be performed by a licensed physician to be reimbursable.

85.     Furthermore, the ESWT allegedly performed on Insureds was fraudulent because the service that was allegedly provided does not qualify for reimbursement under the CPT code for several independent reasons. In the first instance, the charges were fraudulent in that the unlicensed technicians controlled by the John Doe Defendants did not even actually provide ESWT or any service that satisfied the requirements of CPT code 0101T. Rather, the John Doe Defendants arranged to have the unlicensed technicians perform Radial Pressure Wave Therapy on the Insureds. Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave. Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T, which requires "high energy" shockwave.

86.     Second, the charges were fraudulent because the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational in nature. In fact, and in keeping with that characterization: (i) the use of ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain, (ii) there are no legitimate peer reviewed studies that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain, and (iii) the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

87.     Notwithstanding the experimental nature, the Defendants purportedly provided ESWT as part of a pre-determined fraudulent protocol to virtually every Insured, without regard to each Insured's individual complaints, symptoms, or presentation. In furtherance of that, the Defendants typically submitted a boilerplate, checklist treatment report containing a stamped

signature, not an actual signature, and the ESWT was provided to Insureds soon after their accident without giving the patients the opportunity to sufficiently respond to conservative therapies.

88.     For example, the Defendants typically rendered ESWT to Insureds less than twenty (20) days after the accidents, including the following examples:

(i)     Defendants purported to provide ESWT through the Kalitenko PC to an Insured named JF on November 4, 2021, only 9 days after the Insured's accident on October 26, 2021.

(ii)    Defendants purported to provide ESWT through the Kalitenko PC to an Insured named JR on November 9, 2021, only 10 days after the Insured's accident on October 29, 2021.

(iii)   Defendants purported to provide ESWT through the Kalitenko PC to an Insured named MG on January 11, 2022, only 5 days after the Insured's accident on January 6, 2022.

(iv)    Defendants purported to provide ESWT through the Kalitenko PC to an Insured named VD on January 12, 2022, only 2 days after the Insured's accident on January 10, 2022.

(v)     Defendants purported to provide ESWT through the Kalitenko PC to an Insured named EP on January 12, 2022, only 8 days after the Insured's accident on January 4, 2022.

(vi)    Defendants purported to provide ESWT through the Kalitenko Sole Proprietorship to an Insured named RB on February 17, 2022, only 7 days after the Insured's accident on February 10, 2022.

(vii)   Defendants purported to provide ESWT through the Kalitenko Sole Proprietorship to an Insured named TG on March 3, 2022, only 3 days after the Insured's accident on February 28, 2022.

(viii)  Defendants purported to provide ESWT through the Kalitenko Sole Proprietorship to an Insured named RM on March 7, 2022, only 6 days after the Insured's accident on March 1, 2022.

(ix)    Defendants purported to provide ESWT through the Kalitenko Sole Proprietorship to an Insured named RB on March 16, 2022, only 3 days after the Insured's accident on March 13, 2022.

    (x)    Defendants purported to provide ESWT through the Kalitenko Sole Proprietorship to an Insured named VD on March 24, 2022, only 2 days after the Insured's accident on March 22, 2022.

89.    These are only representative examples. Additionally, the Defendants routinely provided ESWT to multiple Insureds involved in the same accident from the same Clinics. For example:

    (i)    On September 9, 2021, two Insureds – MN and YP – were involved in the same automobile accident. Thereafter, MN and YP both presented to the same Clinic located at 97-01 101st Avenue, Queens, New York, and each purportedly received ESWT "treatments" through the Kalitenko PC on multiple occasions.

    (ii)    On September 16, 2021, two Insureds – AB and MB – were involved in the same automobile accident. Thereafter, AB and MB both presented to the same Clinic location at 90-16 Sutphin Boulevard, Queens, New York, and each purportedly received ESWT "treatments" through the Kalitenko Sole Proprietorship.

    (iii)    On October 1, 2021, two Insureds – JM and SQ – were purportedly involved in the same automobile accident. Thereafter, JM and SQ both presented to the same Clinic location at 92-08 Jamaica Avenue, Queens, New York, and each purportedly received ESWT "treatments" through the Kalitenko PC on multiple occasions.

    (iv)    On October 29, 2021, four Insureds – JR, MH, MR, and EN – were involved in the same automobile accident. Thereafter, JR, MH, MR, and EN presented to the same Clinic located at 92-08 Jamaica Avenue, Queens, New York and each purportedly received ESWT "treatments" through the Kalitenko PC on multiple occasions.

    (v)    On November 20, 2021, two Insureds – AO and DO – were involved in the same automobile accident. Thereafter, AO and DO both presented to the same Clinic location at 599 Southern Boulevard, Bronx, New York, and each purportedly received ESWT "treatments" through the Kalitenko Sole Proprietorship.

    (vi)    On November 25, 2021, two Insureds – LA and SS – were involved in the same automobile accident. Thereafter, LA and SS presented to the same Clinic located at 717 Southern Boulevard, Bronx, New York, and each purportedly received ESWT "treatments" through the Kalitenko Sole Proprietorship.

(vii)    On January 4, 2022, two Insureds – TK and AM – were involved in the same automobile accident. Thereafter, TK and AM presented to the same Clinic located at 282-284 Avenue X, Brooklyn, New York, and each purportedly received ESWT "treatments" through the Kalitenko Sole Proprietorship on multiple occasions.

(viii)    On January 9, 2022, three Insureds – JR, BR, and SR – were involved in the same automobile accident. Thereafter, JR, BR, and SR presented to the same Clinic located at 1568 Ralph Avenue, Brooklyn, New York, and each purportedly received ESWT "treatments" through the Kalitenko Sole Proprietorship on multiple occasions.

(ix)    On January 1, 2022, three Insureds – BJ, TP, and MT – were involved in the same automobile accident. Thereafter, BJ, TP, and MT presented to the same Clinic located at 560 Prospect Avenue, Brooklyn, New York, and each purportedly received ESWT "treatments" through the Kalitenko Sole Proprietorship on multiple occasions.

(x)    On January 26, 2022, two Insureds – JB and CE – were involved in the same automobile accident. Thereafter, JB and CE presented to the same Clinic located at 7945 Metropolitan Avenue, Queens, New York, and each purportedly received ESWT "treatments" through the Kalitenko Sole Proprietorship.

90.    These are only representative examples. In all the claims identified in Exhibit "1", the Defendants falsely represented that Fraudulent Services were medically necessary, when in fact they were not medically necessary for each Insured and provided pursuant to predetermined fraudulent protocols and were therefore not eligible to collect No-Fault Benefits in the first instance.

91.    In addition to the billing for ESWT being fraudulent for the reasons described above, the charges were also fraudulent because the bills misrepresented the amounts collectible for each date of service. More specifically, CPT Code 0101T only contemplates the billing for the code once per date of service. The code specifically describes the service as pertaining to the "musculoskeletal system", not a patient's individual limb or spine/trunk sections.

92.     Notwithstanding the clear language of the code, the bills from both Kalitenko Practices fraudulently unbundled the service in the billing that was prepared and submitted by duplicating the code multiple times (and increasing the corresponding charges) for each section of the Insured's body to which the ESWT was performed.

93.     In testing the fraudulent scheme, the Defendants initially billed for 2 units for each date of service.  Once the Defendants put the fraudulent scheme into overdrive in 2022, they billed for 3 units for each date of service.

94.     The following is a representative sample of the bills submitted from each of the Kalitenko Practices:

### Kalitenko PC

| 15. REPORT OF SERVICES RENDERED – ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 12/08/2021 | see below* | Extracorporeal Shock Wave Therap | 0101T RT/KN | 699.00 |
| 12/08/2021 | see below* | Extracorporeal Shock Wave Therap | 0101T LT/KN | 699.00 |
| *92-08 JAMAICA AVE WOODHAVEN, NY 11421 | | | TOTAL CHARGES TO DATE$ | 1398.00 |

### Kalitenko Sole Proprietorship

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | | |
|---|---|---|---|---|---|
| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Unit | Fee Schedule Treatment Code | Charges |
| 02/17/2022 | 4009 Church Ave, Brooklyn, NY, 11203 | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy (Cervical ) | 1 | 0101T | $ 700.39 |
| 02/17/2022 | 4009 Church Ave, Brooklyn, NY, 11203 | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy (Lumbar ) | 1 | 0101T | $ 700.39 |
| 02/17/2022 | 4009 Church Ave, Brooklyn, NY, 11203 | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy (Shoulder Right ) | 1 | 0101T | $ 700.39 |

TOTAL CHARGES TO DATE  $ 2101.17

95.     In doing so, the Defendants artificially and fraudulently increased the amount of reimbursement to which they would be entitled by two (2) or three (3) times for each date of services.

96.     In all of the claims identified in Exhibit "1" for ESWT testing, the Defendants falsely represented that the ESWT charges were medically necessary, were performed by Kalitenko, and were appropriately charged, when in fact they were not medically necessary for each Insured, were conducted by unlicensed technicians pursuant to predetermined fraudulent protocols, were inappropriately unbundled, and were therefore not eligible to collect No-Fault Benefits in the first instance.

### 2.     The Fraudulent Charges for VNG Testing

97.     As with the charges for ESWT, Kalitenko and John Doe Defendants also purported to systemically subject Insureds to useless VNG testing, through the Kalitenko Sole Proprietorship. Between February and March of 2022, the Defendants (through the collection lawyers) submitted more than 230 separate fraudulent bills to GEICO seeking more than $150,000.00 for the alleged performance of VNG services on approximately 230 separate Insureds. The charges for the VNG tests were fraudulent in that the VNG tests were medically unnecessary and were performed, to the extent that they were performed at all, pursuant to the payments that were provided to the Clinics.

98.     As part of the Defendants fraudulent scheme using the Kalitenko Sole Proprietorship, and similar to the fraudulent charges for ESWT, Kalitenko and the John Doe Defendants purportedly to systemically subject Insureds to medically unnecessary VNG testing that were never performed by Kalitenko or any another physician, and instead were performed by unlicensed technicians who were not directly supervised by Kalitenko.

99.     As with the charges for ESWT, the VNG tests were part of the fraudulent treatment and billing protocol to bill for medically unnecessary testing, which was designed solely to

financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

100.    Once Defendants subjected Insureds to the medically unnecessary VNG tests, they then typically billed GEICO for the performance of the VNG tests through the Kalitenko Sole Proprietorship using CPT codes 92537, 92540, 92546, 92547, and 92548, resulting in charges to GEICO of $634.34 per Insured per date of service.

101.    VNG consists of tests that can be used to determine the cause of a patient's vertigo or balance disorder.  In other words, VNG tests are not used to confirm the existence of dizziness or balance disorder, but rather to identify the origin of the condition in the relatively rare cases where it cannot be determined through an ear, nose and throat ("ENT") or neurological medical examination. Generally, VNG tests are employed to determine the source of the generation of vertigo, i.e., the inner ear or brain.

102.    VNG tests should not be used as a first-line diagnostic procedure when a patient reports dizziness as the result of automobile accident trauma. A legitimate diagnostic process for a patient reporting dizziness following an automobile accident should begin with a history and physical examination, including an ENT and neurological examination.  VNG tests record involuntary eye movements, called nystagmus, using video imaging technology. The nystagmus is recorded and analyzed using sophisticated video goggles which are equipped with infrared video cameras. The patient wears these goggles while being subjected to various stimuli, which duplicates the extraocular movement portion of the physical examination.

103.    There are four main components to VNG testing: (i) the saccade test, which evaluates rapid eye movements between fixation points; (ii) the tracking test, which evaluates movement of the eyes as they pursue a visual target; (iii) the positional test, which measures eye

movements associated with positions of the head; and (iv) the caloric test, which measures responses to warm or cold water or air circulated through the ear canal. The cameras record the eye movements and display them on a video/computer screen. This allows the physician to see how the eyes move, which helps the physician assess the patient's balance, which in turn helps the physician assess the source of vertigo.

104.    To properly administer a VNG test, the patient must be prepared appropriately. This preparation typically requires 72 hours of abstention from medication (with the exception of heart, high blood pressure and anticonvulsant medications); 24 hours of abstention from stimulants such as caffeine, as well as alcohol; and three hours of food abstention. In addition, patients must be provided with a pre-test history and examination, to determine, among other things, the nature of the problematic symptoms and the patient's eye movements.

105.    The Insureds who purportedly received a VNG test from the Kalitenko Sole Proprietorship never had a legitimate examination to determine if a VNG test was medically necessary.

106.    Instead, the VNG testing was performed pursuant to referrals issued by the Clinic's representatives, who were not licensed healthcare professionals, and who issued the referrals as part of a pre-determined protocol and illegal kickback and financial relationships established by the Defendants.

107.    To the extent any licensed healthcare provider conducted a medical history and examinations that assessed the Insureds' neurological symptoms and referred the Insureds for VNG testing, virtually none of the Insureds who allegedly received VNG testing through the Kalitenko Sole Proprietorship ever reported experiencing dizziness, imbalance, or vertigo in the examination reports that preceded the VNG testing.

108.    Moreover, even if an Insured reported the existence of some general form of dizziness or balance disorder, the VNG tests supposedly provided by the Kalitenko Sole Proprietorship were medically unnecessary because the cause of the Insured's dizziness or imbalance could be identified through the physical examinations and the patient histories that were purportedly conducted during every initial consultation and follow-up examination at each Clinic.

109.    Because VNG tests properly are limited to circumstances in which the origin of a patient's vertigo is unclear, there is no legitimate reason to use VNG tests where – as in the case of every Insured who supposedly received VNG testing from the Kalitenko Sole Proprietorship.

110.    Furthermore, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.  An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in a given automobile accident.  It is extremely improbable – to the point of biological impossibility – that multiple Insureds involved in the same automobile accident who treated at a specific Clinic would routinely require VNG testing at or about the same time.

111.    Even so, and in keeping with the fact that the VNG testing allegedly performed by Defendants through the Kalitenko Sole Proprietorship was not medically necessary and was performed pursuant to predetermined protocols to maximize profits, the Defendants routinely provided VNG testing to multiple Insureds involved in the same accident at or about the same time.

112.    For example:

(i)    On November 23, 2021, two insureds – CL and AF – were involved in the same automobile accident.  Thereafter, CL and AF both – incredibly –

received VNG testing from the Kalitenko Sole Proprietorship <u>on the same exact date</u>, February 3, 2022.

(ii)    On December 22, 2021, two insureds – EK and AG – were involved in the same automobile accident.  Thereafter, EK and AG both – incredibly – received VNG testing from the Kalitenko Sole Proprietorship <u>on the same exact date</u>, February 16, 2022.

(iii)    On December 30, 2021, two insureds – MD and AS – were involved in the same automobile accident.  Thereafter, MD and AS both – incredibly – received VNG testing from the Kalitenko Sole Proprietorship <u>on the same exact date</u>, February 2, 2022.

(iv)    On January 3, 2022, two insureds – OJ and MC – were involved in the same automobile accident.  Thereafter, OJ and MC both – incredibly – received VNG testing from the Kalitenko Sole Proprietorship <u>on the same exact date</u>, February 10, 2022.

(v)    On January 11, 2022, two insureds – JC and RC – were involved in the same automobile accident.  Thereafter, JC and RC both – incredibly – received VNG testing from the Kalitenko Sole Proprietorship <u>on the same exact date</u>, February 21, 2022.

(vi)    On January 17, 2022, two insureds – AM and SK – were involved in the same automobile accident.  Thereafter, AM and SK both – incredibly – received VNG testing from the Kalitenko Sole Proprietorship <u>on the same exact date</u>, February 7, 2022.

(vii)    On January 22, 2022, two insureds – JR and MB – were involved in the same automobile accident.  Thereafter, JR and MB both – incredibly – received VNG testing from the Kalitenko Sole Proprietorship <u>on the same exact date</u>, February 15, 2022.

(viii)    On February 5, 2022, two insureds – NC and JC – were involved in the same automobile accident.  Thereafter, NC and JC both – incredibly – received VNG testing from the Kalitenko Sole Proprietorship <u>on the same exact date</u>, February 21, 2022.

(ix)    On February 11, 2022, two insureds – NM and EB – were involved in the same automobile accident.  Thereafter, NM and EB both – incredibly – received VNG testing from the Kalitenko Sole Proprietorship <u>on the same exact date</u>, February 22, 2022.

(x)    On February 18, 2022, two insureds – MMC and MC – were involved in the same automobile accident.  Thereafter, MMC and MC both – incredibly

– received VNG testing from the Kalitenko Sole Proprietorship on the same exact date, February 28, 2022.

113.    These are only representative examples. In many of the claims involving two or more Insureds who had been in the same underlying accident and allegedly received VNG testing from the Kalitenko Sole Proprietorship, the Insureds received VNG testing at or about the same time, despite the fact that the Insureds were differently situated.

114.    As part of the Defendants participation fraudulent scheme to bill GEICO, and other automobile insurers, for the Fraudulent Services, all the referrals to the Kalitenko Sole Proprietorship for VNG testing were by the Clinic's representatives, who were not licensed healthcare professionals, as part of the illegal kickbacks and financial arrangement scheme with the John Doe Defendants at the Clinics.

115.    Further, and in keeping with the fact that the VNG tests purportedly provided by the Kalitenko Sole Proprietorship were medically unnecessary, no physician or healthcare provider associated with the Defendants were involved in performing or interpreting the VNG testing. Instead, as part of the Defendants fraudulent scheme, once the Clinic representatives referred Insureds to the Kalitenko Sole Proprietorship for VNG testing, unlicensed laypersons, at the direction of the John Doe Defendants, subjected the Insureds to purported VNG testing, without any involvement of Kalitenko or another physician.

116.    In keeping with the fact that the VNG tests were not medically necessary and did not involve any physician to perform or interpret the results, in the circumstance that the VNG tests produced a "positive" or "inconclusive result", the Insureds did not undergo any form of vestibular rehabilitation, balance retraining, or any other therapy to address their putative balance issues.

117.     As with the billing for ESWT, in all of the claims identified in Exhibit "1" for VNG testing, the Defendants falsely represented that the VNG tests were performed by Kalitenko and were medically necessary, when in fact they were not medically necessary for each Insured, were conducted by unlicensed technicians pursuant to predetermined fraudulent protocols and were therefore not eligible to collect No-Fault Benefits in the first instance.

### 3.     The Fraudulent Charges for TDT Testing

118.     Kalitenko and the John Doe Defendants also purported to systemically subject Insureds to useless TDT testing through the Kalitenko Sole Proprietorship.  Between February and March of 2022, the Defendants (through the collection lawyers) fraudulently submitted more than 220 separate bills to GEICO seeking more than $365,000.00 for the alleged performance of TDT testing on approximately 220 separate Insureds. The charges for the TDT tests were fraudulent in that the TDT tests were medically unnecessary and were performed, to the extent that they were performed at all, pursuant to the payments that were provided to the Clinics.

119.     As part of the Defendants fraudulent scheme through the Kalitenko Sole Proprietorship, and similar to the charges for the other Fraudulent Services, Kalitenko and the John Doe Defendants purportedly to systemically subject Insureds to medically unnecessary TDT testing  that were never performed by Kalitenko or another physician, and instead were performed by unlicensed technicians who were not directly supervised by Kalitenko.

120.     As with the charges for TDT tests were part of the fraudulent treatment and billing protocol to bill for medically unnecessary testing, which was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

121.     Once Defendants subjected Insureds to the medically unnecessary TDT tests, they then typically billed GEICO for the performance of the TDT tests through the Kalitenko Sole Proprietorship using CPT codes 93886, 93890, 92546, 93892, and 93980, resulting in charges to GEICO of $1641.79 per Insured per date of service.

122.     TDT is a noninvasive technique that uses sound waves to evaluate blood flow (blood circulation) in and around the brain.  TDT typically uses a doppler transducer that enables recording of blood flow velocities from intracranial arteries through selected cranial foramina and thin regions of the skull.  Mapping of the sampled velocities as a color display of spectra locates the major brain arteries in three dimensions.

123.     TDT obtains information about the physiology of blood flow through the intracranial cerebrovascular system.  Depending on the type of measurement needed, TDT studies can take at least 45 minutes, if not more.  TDT evaluation of the intracranial cerebrovascular system is generally used in connection with the following:

- Vasopasm, following a ruptured brain aneurysm;

- Sickle cell anemia, to determine a patient's risk of stroke;

- Ischemic stroke;

- Intracranial stenosis or blockage of the blood vessels;

- Cerebral microemboli; and/or

- Patent Foramen Ovale, a hole in the heart that doesn't close properly after birth, which may provoke embolic stroke.

124.     The symptomology of the above-named conditions includes sudden severe headache with no known cause; numbness, weakness, or paralysis of the face, arm, leg, or one side of the body; confusion; trouble speaking, seeing, or walking; and/or sudden dizziness, loss of

balance, or loss of coordination. Headaches, dizziness, and head trauma by themselves are not indications for the performance of TDT studies of the intracranial cerebrovascular system.

125. Moreover, in the event the Insureds did suffer from any such symptoms, the onset of those symptoms was neither sudden nor unexplained but rather a purported result of the motor vehicle accidents that caused the Insured to seek treatment at the No-Fault Clinics in the first instance. In a legitimate setting, if a physician needs to examine a patient's intracranial blood flow, he or she orders a magnetic resonance angiogram ("MR angiogram") or a computed tomography angiogram ("CT angiogram"), both of which measure intracranial blood flow with more accuracy than TDT. Indeed, in the claims that were purportedly provided through the Kalitenko Sole Proprietorship there were virtually no clinical indications for the performance of TDT in an outpatient setting.

126. Similar to the VNG testing, the Insureds who purportedly received TDT from the Kalitenko Sole Proprietorship never had a legitimate examination to determine if TDT was medically necessary.

127. Instead, the TDT was performed pursuant to referrals issued by the Clinic's representatives, who were not licensed healthcare professionals, and who issued the referrals as part of a pre-determined protocol and illegal kickback and financial relationships established by the Defendants.

128. In keeping with the fact that the TDT was performed pursuant to predetermined treatment protocols, not by any licensed healthcare provider, any medical examinations performed on Insureds at the Clinics often failed to screen for the symptoms that would warrant a TDT.

129. To the extent any licensed healthcare provider conducted a medical history and examinations, the examination did not assess the Insureds' head pain and neurological symptoms,

in virtually all cases where the Defendants purported to provide TDT, the Insureds did not suffer any sort of injury as the result of the automobile accident that would warrant the TDT.

130.     As with the other Fraudulent Services, the TDT was rendered and billed pursuant to a fraudulent treatment and billing protocol that was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests. Indeed, even had the Insureds displayed symptoms warranting a TDT in a legitimate clinical setting the practitioner would initially administer a transcranial doppler study of the intracranial arteries, billed under CPT 93886, and would only proceed to perform a vasoreactivity test, billed under CPT 93890, or a microemboli study, billed under CPT 93892 if the Insured displayed symptomology warranting that additional testing. By contrast to the manner in which TDT would legitimate be performed and billed, here, the Kalitenko Sole Proprietorship purported to provide all three studies on very Insured who received TDT.

131.     Moreover, in keeping with the fact that the TDT purportedly performed by the Defendants was not medically necessary and was performed pursuant to predetermined protocols to maximize profits, the Kalitenko Sole Proprietorship routinely provided TDT to multiple Insureds involved in the same accident at or about the same time.

132.     For example:

(i)      On November 23, 2021, two insureds – CL and AF – were involved in the same automobile accident.  Thereafter, CL and AF both – incredibly – received three different forms of TDT from the Kalitenko Sole Proprietorship on the same exact date, February 3, 2022.

(ii)     On December 22, 2021, two insureds – EK and AG – were involved in the same automobile accident.  Thereafter, EK and AG both – incredibly – received three different forms of TDT from the Kalitenko Sole Proprietorship on the same exact date, February 16, 2022.

(iii)    On December 30, 2021, two insureds – MD and AS – were involved in the same automobile accident.  Thereafter, MD and AS both – incredibly –

received three different forms of TDT from the Kalitenko Sole Proprietorship <u>on the same exact date</u>, February 2, 2022.

(iv)   On January 3, 2022, two insureds – OJ and MC – were involved in the same automobile accident.  Thereafter, OJ and MC both – incredibly – received three different forms of TDT from the Kalitenko Sole Proprietorship <u>on the same exact date</u>, February 10, 2022.

(v)   On January 11, 2022, two insureds – JC and RC – were involved in the same automobile accident.  Thereafter, JC and RC both – incredibly – received three different forms of TDT from the Kalitenko Sole Proprietorship <u>on the same exact date</u>, February 21, 2022.

(vi)   On January 17, 2022, two insureds – AM and SK – were involved in the same automobile accident.  Thereafter, AM and SK both – incredibly – received three different forms of TDT from the Kalitenko Sole Proprietorship <u>on the same exact date</u>, February 7, 2022.

(vii)   On January 22, 2022, two insureds – JR and MB – were involved in the same automobile accident.  Thereafter, JR and MB both – incredibly – received three different forms of TDT from the Kalitenko Sole Proprietorship <u>on the same exact date</u>, February 15, 2022.

(viii)   On February 5, 2022, two insureds – NC and JC – were involved in the same automobile accident.  Thereafter, NC and JC both – incredibly – received three different forms of TDT from the Kalitenko Sole Proprietorship <u>on the same exact date</u>, February 21, 2022.

(ix)   On February 11, 2022, two insureds – NM and EB –were involved in the same automobile accident.  Thereafter, NM and EB both – incredibly – received three different forms of TDT from the Kalitenko Sole Proprietorship <u>on the same exact date</u>, February 24, 2022.

(x)   On February 18, 2022, two insureds – MMC and MC – were involved in the same automobile accident.  Thereafter, MMC and MC both – incredibly – received three different forms of TDT from the Kalitenko Sole Proprietorship <u>on the same exact date</u>, February 28, 2022.

133.   These are only representative examples.  In many of the claims involving two or more Insureds who had been in the same underlying accident and allegedly received TDT from the Kalitenko Sole Proprietorship, the Insureds received TDT at or about the same time, despite the fact that the Insureds were differently situated.

134.    In keeping with the fact that all of the purported TDT procedures were medically unnecessary and pursuant to a pre-determined treatment protocol, virtually every Insured who received TDT testing from the Kalitenko Sole Proprietorship also purportedly received VNG on the same date.

135.    As with the other Fraudulent Services, the TDT was rendered and billed pursuant to the Defendants' fraudulent treatment and billing protocol that was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.  Indeed, even had the Insureds displayed symptoms warranting TDT, in a legitimate clinical setting the practitioner would initially administer a transcranial doppler study of the intracranial arteries, billed under CPT 93886, and would only proceed to perform a vasoreactivity test, billed under CPT 93890, or a microemboli study, billed under CPT 93892 if the Insured displayed symptomology warranting that additional testing.  Nevertheless, the Kalitenko Sole Proprietorship purported to provide all three studies on every Insured who received TDT.

136.    As part of the Defendants participation fraudulent scheme to bill GEICO, and other automobile insurers, for the Fraudulent Services, all the referrals to the Kalitenko Sole Proprietorship for TDT were by the Clinic's representatives, who were not licensed healthcare professionals, as part of the illegal kickbacks and financial arrangement scheme with the John Doe Defendants at the Clinics.

137.    Further, and in keeping with the fact that the TDT tests purportedly provided by the Kalitenko Sole Proprietorship were medically unnecessary, no physician or healthcare provider associated with the Defendants were involved in performing or interpreting the TDT testing. Instead, as part of the Defendants fraudulent scheme, once the Clinic representatives referred Insureds to the Kalitenko Sole Proprietorship for VNG testing, unlicensed laypersons, at the

direction of the John Doe Defendants, subjected the Insureds to purported VNG testing, without any involvement of Kalitenko or another physician.

138.    As with the billing for the other Fraudulent Services, in all of the claims identified in Exhibit "1" for TDT, the Defendants falsely represented that the TDT were performed by Kalitenko and were medically necessary, when in fact they were not medically necessary for each Insured, were conducted by unlicensed technicians pursuant to predetermined fraudulent protocols and were therefore not eligible to collect No-Fault Benefits in the first instance.

### E.    The Fraudulent Billing for Independent Contractor Services

139.    The Defendants fraudulent scheme also included the submission of claims to GEICO using the Kalitenko Practices seeking payment for services provided by individuals that the Kalitenko Practices never employed.

140.    Under the New York no-fault insurance laws, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors.  The healthcare services must be provided by the billing provider itself, or by its employees.

141.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services");  DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion

Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals).

142.    From October 2021 through March 2022, more than 2,350 separate bills were sent to GEICO using the United States mails seeking payment for the Fraudulent Services purportedly performed by individuals other than Kalitenko, while falsely representing in every bill that Kalitenko was the provider of the service in question. This was done intentionally and to avoid the possibility that insurance companies such as GEICO would deny the bill for eligibility if an accurate representation been made regarding who actually performed the services and their relationship to the billing provider, which was being unlawfully operated and controlled by the John Doe Defendants.

143.    In fact, virtually every NF-3 form that was submitted to GEICO appeared as follows:

| 16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING. | | | | | |
|---|---|---|---|---|---|
| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO. | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| KALITENKO  SERGEY  A | | 211326 | | ** | |

17  IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS (Provide an additional attachment if necessary)

| 18  IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION? | YES | xx | NO | |
|---|---|---|---|---|

19   ESTIMATED  DURATION OF FUTURE TREATMENT

144.    In fact, the statements in each of the NF-3 forms were false and fraudulent in that the unlicensed technicians who performed the Fraudulent Services were never (i) employed by Kalitenko or either of the Kalitenko Practices, or (ii) under Kalitenko's direction and/or control.

145.    In fact, the unlicensed technicians were simultaneously performing services for multiple other "providers" being operated and controlled by the John Doe Defendants and were paid without regard to the physician's name or entity through whom the Fraudulent Services were billed.

146.    In keeping with the fact that the unlicensed technicians performed the Fraudulent Services under the operation and control by the John Doe Defendants, without regard to the physician's name or entity that billed for the Fraudulent Services, virtually all of the Insureds identified in Exhibit "1" received ESWT from various providers, including either the Kalitenko PC or the Kalitenko Sole Proprietorship, at a single Clinic.

147.    For example:

(i)    An Insured named RB was involved in an automobile accident and presented to the Clinic located at 3027 Avenue V, Brooklyn, New York (the "Avenue V Clinic"). While treating at the Avenue V Clinic, RB purportedly received ESWT from Kalitenko through the Kalitenko Sole Proprietorship, and also purportedly received ESWT from: (i) Chand Medical, PC ("Chand") by Rajesh Vindhya, M.D. ("Vindhya"); (ii) Big Apple Medical Services, PC ("Big Apple") by Michael Davy, M.D. ("Davy"); (iii) KBJ Medical Practice ("KBJ") by Kelvin Jack, M.D. ("Jack"); (iv) Wilkins Williams Medical, PC ("WWM") by Wilkins Williams, M.D. ("Williams); (v) Olubusola Brimmo, M.D. ("Brimmo"); and (vi) Pro-Medica PC ("Pro-Medica") by Boris Sheinkerman, M.D. ("Sheinkerman").

(ii)    An Insured named MD was involved in an automobile accident and presented to the Clinic located at 1847 Utica Avenue, Brooklyn, New York (the "Utica Avenue Clinic"). While treating at the Utica Avenue Clinic, MD purportedly received ESWT from Kalitenko through the Kalitenko Sole Proprietorship, and also purportedly received ESWT from: (i) KBJ by Jack; (ii) Grace Health Medical Provider ("Grace") by Opeoluwa Eleyinafe, M.D. ("Eleyinafe"); (iii) Brimmo; (iv) Pro-Medica by Sheinkerman; (v) Maxine Coles Services ("MCS") by Maxine Coles, M.D. ("Coles"); and (vi) Steven Wong, M.D. ("Wong").

(iii)    An Insured named RP was involved in an automobile accident and presented to the Utica Avenue Clinic. While treating at the Uticia Avenue Clinic, RP purportedly received ESWT from Kalitenko through the Kalitenko Sole Proprietorship, and also purportedly received ESWT from: (i) KBJ by Jack; (ii) Brimmo; (iii) Pro-Medica by Sheinkerman; (iv) Wong; and (v) MCS by Coles.

(iv)    An Insured named AB was involved in an automobile accident and presented to the Church Ave Clinic. While treating at the Church Ave Clinic, AB purportedly received ESWT from kalitenko through the Kalitenko Sole Proprietorship, and also purportedly received ESWT from: (i) Emmons Avenue Medical Office ("Emmons") by Ruben Oganesov, M.D. ("Oganesov"); (ii) CVAP Medical PC ("CVAP") by Crystal Antoine-Pepeljugoski, M.D. ("Pepeljugoski"); (iii) Eric Kenworthy, M.D. ("Kenworthy"); (iv) Headlam Medical PC ("Headlam PC") by Bo Tyler Headlam, M.D. ("Headlam"); (v) Mark Vine M.D. ("Vine"); (vi) Grace by Eleyinafe; and (vii) MJG Medical Services ("MJG") by Max Jean-Gilles, M.D. ("Gilles").

(v)    An Insured named AG was involved in an automobile accident and presented to the Clinic located at 92-08 Jamaica Avenue, Woodhaven, New York ("the Jamaica Ave Clinic"). While treating at the Jamaica Ave Clinic, AG purportedly received ESWT from Kalitenko through the Kalitenko PC, and also purportedly received ESWT from: (i) Chand by Vindhya; and (ii) Miklos Losonczy, M.D. ("Losonczy").

(vi)    An Insured named KG was involved in an automobile accident and presented to the Clinic located at 1120 Morris Park Avenue, Bronx, New York ("the Morris Park Clinic"). While treating at the Morris Park Clinic, KG purportedly received ESWT from Kalitenko through the Kalitenko Sole Proprietorship, and also purportedly received ESWT from: (i) Grace by Eleyinafe; and (ii) Vine.

(vii)    An Insured named MD was involved in an automobile accident and presented to the Clinic located at 3250 Westchester Avenue, Bronx, New York (the "Westchester Avenue Clinic"). While treating at the Westchester Avenue Clinic, MD purportedly received ESWT from Kalitenko through the Kalitenko Sole Proprietorship, and also purportedly received ESWT from: (i) Grace by Eleyinafe; (ii) Brimmo; and (iii) Kenworthy

(viii)    An Insured named EC was involved in an automobile accident and presented to the Clinic located at 66-42 Myrtle Avenue, Ridgewood, New York (the Myrtle Avenue Clinic"). While treating at the Myrtle Avenue Clinic, EC purportedly received ESWT from Kalitenko through the Kalitenko PC, and also purportedly received ESWT from: (i) KBJ by Jack; and (ii) Ilana Etelzon MD PC by Ilana Etelzon, M.D.

(ix)     An Insured named VD was involved in an automobile accident and presented to the Clinic located at 9701 101st Avenue, Jamaica, New York (the "101st Avenue Clinic"). While treating at the 101st Avenue Clinic, VD purportedly received ESWT from Kalitenko through the Kalitenko PC, and also purportedly received ESWT from from: (i) Pro-Medica by Sheinkerman; and (ii) MCS by Coles.

(x)      An Insured named AD was involved in an automobile accident and presented to the Clinic located at 488 Lafayette Avenue, Brooklyn, New York (the "Lafayette Avenue Clinic"). While treating at the Lafayette Avenue Clinic, AD purportedly received ESWT from Kalitenko through the Kalitenko Sole Proprietorship, and also purportedly received ESWT from: (i) Grace by Eleyinafe; and (ii) Brimmo.

148.    These are only representative samples. Virtually all the Insureds identified in Exhibit "1" treated at Clinics that employed unlicensed technicians to perform the Fraudulent Services on Insureds, which were subsequently billed to GEICO and other New York automobile insurers through multiple healthcare providers that did not perform or directly supervise the Fraudulent Services.

149.    Because the Fraudulent Services, to the extent provided at all, were performed by individuals not employed by Kalitenko and/or the Kalitenko Practice, the Defendants never had any right to bill or to collect No-fault Benefits for that reason or to realize any economic benefit from the claims seeking payment for the Fraudulent Services, in addition to all others identified in this Complaint. The misrepresentations and acts of fraudulent concealment outlined in this Complaint were consciously designed to mislead GEICO into believing that it was obligated to pay the claim submissions.

## III.    **The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

150.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted to GEICO thousands of NF-3 forms, AOBs and medical reports/records using the name of the Kalitenko Practices and their tax identification numbers seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

151.    The NF-3 forms, reports, AOBs and other documents submitted to GEICO by and

on behalf of Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that Kalitenko had performed the Fraudulent Services and that his name, license and the tax identification numbers of the Kalitenko Practices were being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact that the John Doe Defendants unlawfully and secretly controlled, operated and managed each medical "practice".

(ii)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants, uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants, uniformly concealed the fact that the Fraudulent Services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements.

(iv)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that the Fraudulent Services were medically necessary when the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

(v)     The NF-3 forms, letters and other supporting documentation submitted by, and on behalf of, the Defendants, uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 even though the services were provided by unlicensed individuals not employed by Kalitenko or either of the Kalitenko Practices.

## IV.    **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

152.    Defendants legally and ethically were obligated to act honestly and with integrity

in connection with the billing that they submitted, or caused to be submitted, to GEICO.

153.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically made material misrepresentations, concealed their fraud and the underlying fraudulent scheme and went to great lengths to accomplish this concealment.

154.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Kalitenko in the performance of the Fraudulent Services and Kalitenko's ownership, control and/or management of the Kalitenko Practices. Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

155.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed, to the extent they were performed at all, pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.  In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the unlicensed individuals to prevent GEICO from discovering that the Fraudulent Services were not eligible for reimbursement because they were not provided by individuals that were employed by Kalitenko and/or either of the Kalitenko Practices.

156.    GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon

them. As a result, GEICO incurred damages of more than $510,000.00 based upon the fraudulent charges.

157.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Against Kalitenko Sole Proprietorship and Kalitenko PC**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

158.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 157 of this Complaint as if fully set forth at length herein.

159.    There is an actual case and controversy between GEICO on the one hand and Kalitenko Sole Proprietorship and Kalitenko PC on the other hand regarding more than $3.1 million in unpaid billing for the Fraudulent Services that were submitted to GEICO.

160.    The Kalitenko Sole Proprietorship and Kalitenko PC have no right to receive payment from GEICO on the unpaid billing because the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers.

161.    The Kalitenko Sole Proprietorship and Kalitenko PC have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to illegal kickbacks and referral relationships between the Defendants and the Clinics.

162.    The Kalitenko Sole Proprietorship and Kalitenko PC have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically

necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols that serve to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

163.    The Kalitenko Sole Proprietorship and Kalitenko PC have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

164.    The Kalitenko Sole Proprietorship and Kalitenko PC have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

165.    The Kalitenko Sole Proprietorship and Kalitenko PC have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented that they were performed by Kalitenko and were instead performed - to the extent that they were provided at all - by unlicensed individuals who were neither supervised by nor employed by Kalitenko, the Kalitenko Sole Proprietorship, or Kalitenko PC.

166.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Kalitenko Sole Proprietorship and Kalitenko PC have no right to receive payment for any pending bills submitted to GEICO.

<u>**AS AND FOR A SECOND CAUSE OF ACTION**</u>
**Against Kalitenko and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

167.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 157 of this Complaint as if fully set forth at length herein.

168.     The Kalitenko Sole Proprietorship and Kalitenko PC together constitute an association-in-fact "enterprise" (the "Kalitenko Fraud Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

169.     The members of the Kalitenko Fraud Enterprise are and have been associated through time, joined in purposed and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, the Kalitenko Sole Proprietorship and Kalitenko PC are independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

170.     The Kalitenko Fraud Enterprise operated under two separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Kalitenko Fraud Enterprise acting singly or without the aid of each other.

171.     The Kalitenko Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance

proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

172.    Kalitenko and the John Doe Defendants each has been employed by and/or associated with the Kalitenko Fraud Enterprise.

173.    Kalitenko and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Kalitenko Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the Kalitenko Fraud Enterprise was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through medical practices not legitimately owned or controlled by a licensed physician, but which were being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services - to the extent provided at all - were not provided by Kalitenko or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Kalitenko or employed by either of the

Kalitenko Practices. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "1".

174. Kalitenko Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Kalitenko and the John Doe Defendants operate the Kalitenko Fraud Enterprise, inasmuch as the Kalitenko Fraud Enterprise Sole never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Kalitenko Sole Proprietorship and Kalitenko PC to the present day.

175. The Kalitenko Fraud Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the Kalitenko Fraud Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $510,000.00 pursuant to the fraudulent bills submitted by the Kalitenko and the John Doe Defendants through the Kalitenko Fraud Enterprise.

176. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Against Kalitenko and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

177.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 157 of this Complaint as if fully set forth at length herein.

178.    The Kalitenko Fraud Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

179.    Kalitenko and the John Doe Defendants are employed by and/or associated with the Kalitenko Fraud Enterprise.

180.    Kalitenko and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Kalitenko Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the Kalitenko Sole Proprietorship and Kalitenko PC were not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through medical practices not legitimately owned or controlled by a licensed physician, but which were being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking

payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services - to the extent provided at all - were not provided by Kalitenko or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Kalitenko or employed by either of the Kalitenko Practices.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "1".

181.    Kalitenko and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

182.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $510,000.00 pursuant to the fraudulent bills submitted by Defendants through the Kalitenko Sole Proprietorship and Kalitenko PC.

183.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Against Kalitenko and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

184.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 157 of this Complaint as if fully set forth at length herein.

185.    The Kalitenko Sole Proprietorship is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Kalitenko and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Kalitenko Sole Proprietorship's affairs through a pattern of racketeering activity

consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the Kalitenko Sole Proprietorship was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through medical practices not legitimately owned or controlled by a licensed physician, but which were being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services - to the extent provided at all - were not provided by Kalitenko or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Kalitenko or employed by the Kalitenko Sole Proprietorship. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "1".

186.    Kalitenko Sole Proprietorship's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Kalitenko and the John Doe Defendants operate the

Kalitenko Sole Proprietorship, inasmuch as the Kalitenko Sole Proprietorship's never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the Kalitenko Sole Proprietorship to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Kalitenko Sole Proprietorship to the present day.

187.    The Kalitenko Sole Proprietorship is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the Kalitenko Sole Proprietorship in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $115,000.00 pursuant to the fraudulent bills submitted by the Kalitenko and the John Doe Defendants through the Kalitenko Sole Proprietorship.

188.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A FIFTH CAUSE OF ACTION
**Against Kalitenko and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

189.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 157 of this Complaint as if fully set forth at length herein.

190.    The Kalitenko Sole Proprietorship is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

191.    Kalitenko and the John Doe Defendants are employed by and/or associated with the Kalitenko Sole Proprietorship.

192.    Kalitenko and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Kalitenko Sole Proprietorship's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the Kalitenko Sole Proprietorship was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through medical practices not legitimately owned or controlled by a licensed physician, but which were being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services - to the extent provided at all - were not provided by Kalitenko or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Kalitenko or employed by the Kalitenko Sole Proprietorship.  The fraudulent billings and corresponding mailings submitted to

GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "1".

193.    Kalitenko and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

194.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $115,000.00 pursuant to the fraudulent bills submitted by Defendants through the Kalitenko Sole Proprietorship.

195.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**Against Kalitenko Sole Proprietorship, Kalitenko, and John Doe Defendants**
**(Common Law Fraud)**

196.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 157 of this Complaint as if fully set forth at length herein.

197.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

198.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Kalitenko had performed the Fraudulent Services and that his name, license and the tax identification number of the Kalitenko Sole Proprietorship was being legitimately used to bill for the Fraudulent Services, making the eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Kalitenko never performed any of the services and the  John Doe Defendants unlawfully and secretly controlled, operated and managed

the Kalitenko Sole Proprietorship; (ii) the representation that the billed for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the representation that the billed for services were eligible for reimbursement, when in fact the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements between the Defendants and the Clinics; (iv) the representation that the billed for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation the billed for services were eligible for payment because the services were provided by Kalitenko, when in fact the services were provided by unlicensed individuals that were never supervised by Kalitenko nor employed by the Kalitenko Sole Proprietorship.

199.   Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Kalitenko Sole Proprietorship that were not compensable under New York no-fault insurance laws.

200.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $115,000.00 pursuant to the fraudulent bills submitted by the Defendants.

201.   Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

202.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Against Kalitenko Sole Proprietorship, Kalitenko, and John Doe Defendants
### (Unjust Enrichment)

203.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 157 of this Complaint as if fully set forth at length herein.

204.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

205.    When GEICO paid the bills and charges submitted by or on behalf of the Kalitenko Sole Proprietorship for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants improper, unlawful, and/or unjust acts.

206.    Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

207.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

208.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $115,000.00.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Against Kalitenko and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

209.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 157 of this Complaint as if fully set forth at length herein.

210.    The Kalitenko PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Kalitenko and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Kalitenko PC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the Kalitenko PC was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through medical practices not legitimately owned or controlled by a licensed physician, but which were being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services - to the extent provided at all - were not provided by Kalitenko or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Kalitenko or employed by the Kalitenko PC. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "1".

211.     Kalitenko PC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Kalitenko and the John Doe Defendants operate the Kalitenko PC, inasmuch as the Kalitenko PC never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the Kalitenko PC to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Kalitenko PC to the present day.

212.     The Kalitenko PC is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the Kalitenko PC in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $395,000.00 pursuant to the fraudulent bills submitted by the Kalitenko and the John Doe Defendants through the Kalitenko PC.

213.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Against Kalitenko and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

214.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 157 of this Complaint as if fully set forth at length herein.

215.    The Kalitenko PC is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

216.    Kalitenko and the John Doe Defendants are employed by and/or associated with the Kalitenko PC.

217.    Kalitenko and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Kalitenko PC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the Kalitenko PC was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through medical practices not legitimately owned or controlled by a licensed physician, but which were being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services - to the extent provided at all - were not provided by Kalitenko or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Kalitenko or employed by the Kalitenko PC.  The fraudulent billings and

corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "1".

218.     Kalitenko and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

219.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $395,000.00 pursuant to the fraudulent bills submitted by Defendants through the Kalitenko PC.

220.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A TENTH CAUSE OF ACTION
### Against Kalitenko PC, Kalitenko, and John Doe Defendants
### (Common Law Fraud)

221.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 157 of this Complaint as if fully set forth at length herein.

222.     Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

223.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Kalitenko had performed the Fraudulent Services and that him name, license and the tax identification number of Kalitenko PC was being legitimately used to bill for the Fraudulent Services, making the eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Kalitenko never performed any of the services and

the John Doe Defendants unlawfully and secretly controlled, operated and managed the Kalitenko PC; (ii) the representation that the billed for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the representation that the billed for services were eligible for reimbursement, when in fact the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements between the Defendants and the Clinics; (iv) the representation that the billed for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation the billed for services were eligible for payment because the services were provided by Kalitenko, when in fact the services were provided by unlicensed individuals that were never supervised by Kalitenko nor employed by Kalitenko PC.

224.    Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Kalitenko PC that were not compensable under New York no-fault insurance laws.

225.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $395,000.00 pursuant to the fraudulent bills submitted by the Defendants.

226.    Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

227.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### Against Kalitenko PC, Kalitenko, and John Doe Defendants
### (Unjust Enrichment)

228.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 157 of this Complaint as if fully set forth at length herein.

229.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

230.    When GEICO paid the bills and charges submitted by or on behalf of Kalitenko PC for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants improper, unlawful, and/or unjust acts.

231.    Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

232.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

233.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $395,000.00.

## JURY DEMAND

234.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor and against the Defendants, as follows:

A.      On the First Cause of Action against the Kalitenko Sole Proprietorship and Kalitenko PC, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Kalitenko Sole Proprietorship and Kalitenko PC have no right to receive payment for any pending bills for the Fraudulent Services submitted to GEICO;

B.      On the Second Cause of Action against Kalitenko and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $510,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Kalitenko and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $510,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Kalitenko and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $115,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.      On the Fifth Cause of Action against Kalitenko and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $115,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.      On the Sixth Cause of Action against Kalitenko Sole Proprietorship, Kalitenko, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $115,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

G.      On the Seventh Cause of Action against Kalitenko Sole Proprietorship, Kalitenko, and John Doe Defendants, more than $115,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Kalitenko and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $395,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Kalitenko and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $395,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.      On the Tenth Cause of Action against Kalitenko PC, Kalitenko, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $395,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper; and

K.      On the Eleventh Cause of Action against Kalitenko PC, Kalitenko, and John Doe Defendants, more than $395,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:  June 28, 2022

RIVKIN RADLER LLP


By: _____/s/_ *Barry I. Levy*_____

      Barry I. Levy, Esq.
      Michael Vanunu, Esq.
      Allison N. Stapleton, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*